IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT D. TUMPA,<br><br>    Plaintiff,<br><br>v.<br><br>IOC-PA-UC-RSM ENTERPRISES, *trading and doing business as* LADY LUCK CASINO,<br><br>    Defendant. | No. 2:17-cv-625<br><br>Magistrate Judge Lisa Pupo Lenihan<br><br>ECF No. 37 |

## OPINION

Currently pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 37) in this age discrimination lawsuit brought under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"). For the reasons set for the below, the Court will grant Defendant's motion.

## I.    FACTS

Plaintiff, Robert Tumpa, was hired by Lady Luck Casino on June 5, 2013 as a dealer for table games, and worked in that capacity until June 18, 2016. Pl.'s Am. Compl. ¶11; Decl. of Merryann Rutherford dated 4/30/18, ¶¶ 10, 11, Def.'s Ex. B (ECF No. 39-1 at 25-26) ("4/30/18 Rutherford Decl.").

According to the Casino's Surveillance Infractions Policy ("SIP"), which Tumpa signed and acknowledged receipt of, points are accumulated for each employee-based

infraction.  Def.'s Ex. C ([ECF No. 39-1 at 28-29](#)); *see also* Pl.'s Dep. at 45-46, Def.'s Ex. D ([ECF No. 39-1 at 47-48](#)).  Six infractions within 60 days on the same table game, or total infractions resulting in excess of $100 on one game type will result in a First Written Warning.  Def.'s Ex. C.   Total infractions in excess of $250 will result in a final written warning.  *Id*.  If an employee displays continual performance deficiencies that are not corrected through the progressive discipline process in the SIP, the Casino will often place the employee on a Performance Improvement Plan ("PIP"), wherein the employee is more closely supervised and given a "last chance" opportunity to correct his/her performance before termination.  4/30/18 Rutherford Decl., ¶ 6.[1]  The Casino did not have to follow the five levels of disciplinary action and could determine the level of discipline based on the severity of the infraction.  Rutherford Dep. at 39: 3-13, Pl.'s Ex. C ([ECF No. 42-3](#)).

Table Games dealers made mistakes, many of which were over $100.  Young Dep. at 76:  4-6, Pl.'s Ex. B ([ECF No. 42-2](#)).  Most employees have surveillance infractions.

---

[1] Tumpa admits that Rutherford so stated in her declaration but disputes this statement on the basis that the record is devoid of any evidence which would show an employee's employment record, or any written Casino policies that specifically outline a PIP policy.  Pl.'s Responsive Concise Stmt., ¶ 5 ([ECF No. 44](#)) ("Pl.'s RCS").  However, Rutherford never testified that a written PIP policy existed.  Rather, she described the Casino's practice when an employee has been unable to correct performance deficiencies and is on the verge of termination.  Tumpa has failed to cite to any evidence in the record which contradicts Rutherford's statement regarding the Casino's PIP practice.  Moreover, the remainder of Tumpa's response to the Casino's Statements of Undisputed Material Facts, ¶ 5 ([ECF No. 38](#)) ("Def.'s SMF"), discusses matters that have no bearing on Rutherford's statement (Pl.'s RCS, ¶ 5).  Thus, the Court finds Tumpa has failed to properly address Rutherford's statement (Def.'s SMF, ¶ 5), as required by [Federal Rule of Civil Procedure 56(c)(1)](#).  As such, the Court considers Rutherford's statement regarding the Casino's PIP practice to be undisputed.  FED. R. FED. P. 56(e)(2).

Rutherford Dep. at 31: 2.

Tumpa received four disciplinary Performance Action Notices in 2013. Def.'s Exs. E through H (ECF No. 39-1 at 62-69). Tumpa received twenty disciplinary Performance Action Notices in 2014. Def.'s Exs. I through BB (ECF No. 39-1 at 70-109). In Tumpa's June 3, 2014 Annual Review, it was noted that Tumpa "has 58 infractions for over $750 in monetary errors" and that Tumpa should "[s]low down and stay focused while on [his] games to reduce the amount of errors [he] had last year." Def.'s Ex. CC at 2, 4 (ECF No. 39-1 at 110-115). It was also noted that Tumpa "has a perfect score in customer service[,]" and "is the best dealer we have at customer service[.]" *Id.* at 2-3. Tumpa received an overall rating of "meets expectations" on his 2014 Annual Review. *Id.* at 5.

Tumpa received thirteen disciplinary Performance Action Notices in 2015. Def.'s Exs. DD through PP (ECF No. 39-1 at 116-141). In Tumpa's June 20, 2015 Annual Review, it was noted that "[t]he number and type of surveillance infractions incurred clearly shows improvement is needed in regards to policy and procedure." Def.'s Ex. QQ at 2 (ECF No. 39-1 at 142-147). Tumpa's 2015 Annual Review also noted that he "has forty-three surveillance infractions, for the year, with a total cost of $212 dollars to the company," and "[w]hile this is a better score than last year some improvement is still needed in this area." *Id.* Tumpa was also told that "[i]n an effort to get the number of surveillance infractions reduced, [he] needs to slow down and stay focused on the task at hand while dealing his game." *Id.* at 3. Tumpa received an overall rating of "meets expectations" on his 2015 Annual Review. *Id.* at 5.

On December 23, 2015, the Casino placed Tumpa on a 90-day Action Plan, which

would run from December 26, 2015 until March 26, 2016.  *See* December 23, 2015 Action Plan, Def.'s Ex. RR (ECF No. 39-1 at 148-149); *see also* Pl.'s Dep., 22:23-23:16.    In this December 2015 Action Plan, Tumpa was told that "[i]f at any time during this 90 Day Action Plan [he] incurs Surveillance Infractions resulting in a monetary value greater than $50, it will result in immediate separation of employment."  Def.'s Ex. RR.

On February 29, 2016, the Casino issued a Performance Document to Tumpa because he had "incurred $45 in surveillance infractions." Def.'s Ex. SS (ECF No. 39-1 at 150-51).  Tumpa was reminded that, per the terms of his December 2015 Action Plan, "[o]nly an additional $5 in errors is acceptable." *Id.*  On March 23, 2016, the Casino issued a Performance Document to Tumpa because he incurred an additional $20 in monetary infractions, resulting in a total of $65 in monetary infractions during his 90-Day Action Plan.  Def.'s Ex. TT (ECF No. 39-1 at 152-53).  Based upon this, the Casino terminated Tumpa on March 23, 2016. Def.'s Ex. UU (39-1 at 154-156).

Subsequently, Tumpa was reinstated to his position at the Casino,[2] and his PIP was re-started but for 60 days instead of 90.  4/30/18 Rutherford Decl. ¶ 9.  Rutherford ensured that Barrish met with Tumpa weekly per the terms of the Plan.  *Id.*; Def.'s Ex. VV (ECF No. 39-1 at 157-58).  Tumpa's April 22, 2016 60-Day Action Plan provided that "[i]f

---

[2] The parties dispute the reason for Tumpa's reinstatement but the reason is not material to the claims here.  The Casino contends that Rutherford discovered that Tumpa's supervisor and its shift manager, Barish, had not been meeting weekly with Tumpa as contemplated by the December 2015 PIP, and therefore, he was returned to work and the Casino restarted his PIP.  4/30/18 Rutherford Decl., ¶ 8.  Tumpa contends that Young called and offered him his job back due to an error by IOC Surveillance.  Pl.'s RCS, ¶ 19 (citing Young Dep. at 44: 24-25 to 45: 1-5; 66: 19-25 to 67:  1-2.)

at any time during this 60 Day Action Plan Dave incurs Surveillance Infractions resulting in a monetary value greater than $50.00, it will result in immediate separation of employment." Def.'s Ex. VV; Pl.'s Dep., 21:10-19.

Tumpa had no monetary infractions during the first week of his 60-Day Action Plan. Def.'s Ex. WW (ECF No. 39-1 at 159-60). On April 29, 2016, Tumpa was told in his Performance Document that "[m]onetary infractions in excess of $50.00 during this action plan will result in immediate termination." *Id.*; Pl.'s Dep., 35:3-36:5. Tumpa had $10 in monetary infractions during the second week of his 60-Day Action Plan. Def.'s Ex. XX (ECF No. 39-1 at 161-62); Pl.'s Dep., 35:23-25 to 36: 1-23. On May 6, 2016, Tumpa was told that he had $40 remaining on his $50 infractions limit, and was reminded that he could "not exceed $50 (total) in errors while on [the] 60 day action plan which ends on 6/22/16." Def.'s Ex. XX. Tumpa was also reminded in his May 6, 2016 Performance Document that "[m]onetary infractions in excess of $50.00 during this action plan will result in immediate termination." *Id.*; Pl.'s Dep., 37:15-25 to 38: 1-11.

Tumpa had no monetary infractions during the third, fourth, or fifth week of his 60-Day Action Plan. Def.'s Exs. YY, ZZ, & AAA (ECF No. 39-1 at 163-68); Pl.'s Dep., 37:21-24; 38:21-25 to 39: 1-4; 40: 8-14. Tumpa was again reminded in his May 13, 2016, May 20, 2016 and May 27, 2016 Performance Documents that he could "not exceed $50 (total) in errors while on [the] 60 day action plan which ends on 6/22/16," and that "[m]onetary infractions in excess of $50.00 during this action plan will result in immediate termination." Def.'s Exs. YY, ZZ, & AAA; Pl.'s Dep., 39:5-13; 40:15-20; 42:4-11.

Tumpa had $35 in monetary infractions during the sixth week of his 60-Day Action

Plan. Def.'s Ex. BBB (ECF No. 39-1 at 169-70; Pl.'s Dep., 41:17-25 to 42: 1-7. On June 3, 2016, Tumpa was told that he had $5 remaining on his $50 infractions limit, and was reminded that he could "not exceed $50 (total) in errors while on [the] 60 day action plan which ends on 6/22/16." Def.'s Ex. BBB. Tumpa was again reminded in his June 3, 2016 Performance Document that "[m]onetary infractions in excess of $50.00 during this action plan will result in immediate termination." *Id.*; Pl.'s Dep., 43:1-14.

Tumpa had no monetary infractions during the seventh week of his 60-Day Action Plan, but was again reminded that he could "not exceed $50 (total) in errors while on [the] 60 day action plan which ends on 6/22/16," and that "[m]onetary infractions in excess of $50.00 during this action plan will result in immediate termination." Def.'s Ex. CCC (ECF No. 39-1 at 171-72); Pl.'s Dep., 43:7-17.

On June 16, 2016, Tumpa committed two $10 errors, which raised the amount of his monetary errors during his 60-Day Action Plan to $65, which was $15 over the $50 maximum of monetary errors which he could commit during his 60-Day Action Plan. Def.'s Ex. DDD (ECF No. 39-1 at 173-74); Pl.'s Dep., 44: 6-25 to 45:1. Tumpa was terminated on June 18, 2016 for not meeting the minimum standard of his 60-day action plan. Def.'s Ex. DDD; 4/30/18 Rutherford Decl., ¶ 11. Tumpa was 64 years of age when the Casino terminated him. Am. Compl., ¶ 8.

Merryann Rutherford, Defendant's Director of Operations, made the decision to terminate Tumpa's employment. 4/30/18 Rutherford Decl., ¶ 10.[3] Rutherford stated

---

[3] Although Rutherford made the ultimate decision to terminate Tumpa, a group of employees reached a consensus to terminate him, which included Rutherford, Robin Valenti from HR, Young and the shift manager—either Barish or DeFelice. Young Dep.

that the basis for terminating Tumpa was his repeated, continued, and long-term display of gaming errors, and because he was unable to complete the terms of his 60-day action plan, which prohibited him from making more than $50 in errors during the 60-day time frame. *Id.* Tumpa made $65 in monetary errors during that time. *Id.* Rutherford did not have any personal criticism about Tumpa's work performance, but she did not directly supervise or manage him on a day to day basis. Rutherford Dep. at 30: 18-23 (Pl.'s Ex. C); Rutherford Dep. at 22: 15-25 to 23: 1-4 (Def.'s Ex. TTT, ECF No. 47-1).

Rutherford was 57 years old at the time of Tumpa's termination. 4/30/18 Rutherford Decl. at ¶11. Tumpa testified that he does not recall Rutherford saying or doing anything to make him believe that she discriminated against him because of his age. Pl.'s Dep. at 56: 22-25 to 57: 1-3. Tumpa also testified that he does not recall his supervisor Marietta Barish ever saying or doing anything to make him believe that she discriminated against him because of his age. *Id.* at 58: 3-12.

At the time of Tumpa's termination, there were dealer schools in progress. Dealer schools are ongoing continuously at the Casino such that it now employs someone in a permanent training position. Rutherford Dep. at 20, Pl.'s Ex. J (ECF No. 42-10). It takes two to three months to get dealer-trainees through dealer school and out onto the floor as dealers. *Id.* The Casino hires everyone who completes dealer school and successfully passes it. *Id.* The Casino did not hire any one person to replace Tumpa. *Id.* at 21. At the time Tumpa was terminated, there was a dealer school in progress training ten dealers, and the dealer-trainees went out on the Casino floor shortly after Tumpa left. *Id.* at 20-

at 38:12-18; 69: 12-16.

21. Of those ten dealer-trainees, eight were under 40 years of age and two were over 40. *Id.* at 22. In addition, the Casino hired seven more dealer-trainees who started dealer school in August of 2016. *Id.* at 21. Six of those dealer-trainees were under 40 years of age, and one was over 40. *Id.* at 22. As of the date of Rutherford's deposition, 65 percent of the Casino's staff of dealers is under 40 years of age and 35 percent is over 40. *Id.*

On October 24, 2016, Tumpa filed his Complaint in the Court of Common Pleas of Fayette County, Pennsylvania, purporting to allege a single count for common law wrongful termination. Def.'s Ex. EEE ([ECF No. 39-1 at 175-86](#)). On or around January 18, 2017, Tumpa dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission alleging that the Casino terminated him because of his age. *See* Charge of Discrimination, Def.'s Ex. FFF ([ECF No. 39-1 at 187-89](#)); Pl.'s Dep. at 97: 5-13. On April 13, 2017, Tumpa amended his complaint to add a claim for discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). *See* ECF No. 1-11. Subsequently, the Casino filed a notice of removal removing the case to this Court.

## II. <u>LEGAL STANDARD</u>

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a) & (c)(1)(A). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non- movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id*. at 249-50 (internal citations omitted).

## III.   DISCUSSION

### A.   ADEA Claim

Tumpa claims that the Casino discriminated against him based on his age when it terminated him, in violation of the ADEA and PHRA.[4]   The ADEA provides that "[i]t shall be unlawful for an employer—(1) to . . . discharge any individual . . . because of such individual's age[.]" 29 U.S.C. §623(a)(1).   However, the ADEA further provides that it is not unlawful "for an employer . . . to discharge or otherwise discipline an employee for good cause." 29 U.S.C. § 623(f)(3).   "To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015)(citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)).   Where, as here, the Tumpa is relying on circumstantial evidence to prove age discrimination, the ADEA claims are scrutinized under the familiar burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).   *See Willis*, 808 F.3d at 644 (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3dCir. 1997) (en banc)).

---

[4] The court of appeals has determined that a single analysis of Plaintiff's claims under both statutes is appropriate.   *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citations omitted).

Under this framework, Tumpa initially bears the burden of establishing a prima facie case of age discrimination by demonstrating that he (1) was 40 years of age or older, (2) suffered an adverse employment action, (3) was qualified for the job, and (4) was ultimately replaced by a sufficiently younger person to create an inference of a discriminatory motive. *Willis*, 808 F.3d at 644 (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013)). The question of whether a plaintiff has established his *prima facie* case is a question of law to be determined by the court. *Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)).

If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Willis*, 808 F.3d at 644 (citing *McDonnell Douglas*, 411 U.S. at 802).

Once the employer carries its burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were not the true reasons, but were merely a pretext for discrimination. *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

In support of its motion for summary judgment, the Casino argues that Tumpa has failed to establish a prima facie case of discrimination based on age. Moreover, even if Tumpa has established a prima facie case of age discrimination, the Casino submits that it has articulated legitimate non-discriminatory reasons for terminating Tumpa, and that Tumpa has failed to demonstrate its reasons are pretextual. The Court will address each of these arguments in turn.

1.     **Tumpa's Prima Facie Case**

The Casino challenges only the third and fourth prongs of Tumpa's prima facie case.  As to the third prong, the Casino argues that Tumpa was not qualified for his job as Table Games Dealer because he made repeated errors on Table Games, resulting in hundreds of mis-pays and monetary infractions, despite opportunities for retraining.  For the purpose of proving a prima facie case, the court determines a plaintiff's qualifications for the job using an objective standard.  *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798-99 (3d Cir. 1990); *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989)).  Subjective factors, such as insubordination, poor performance, misconduct, or an inability to get along with a supervisor, are more logically defenses which should be raised at step two by employers to show that the discharge was based upon legitimate, nondiscriminatory reasons.  *Jalil*, 873 F.2d at 707 (citing cases).

Viewing the evidence in the light most favorable to Tumpa, the Court finds that the record evidence raises the inference that he was qualified for the position of Table Games Dealer.  In support of its argument that Tumpa was not qualified for his position, the Casino points to his repeated and continued errors on Table Games, resulting in hundreds of mis-pays and monetary infractions, despite opportunities to improve his performance, including re-training on several of the Table Games.   The Casino's argument does not address the objective qualifications[5] for the position of Table Games

---

[5] The inquiry into whether a plaintiff is qualified for the position "requires a determination of whether the plaintiff possessed "the bare minimum requirement necessary to perform the job at issue."  *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008).

Dealer, but rather, focuses on its subjective expectations. There is nothing in the record to indicate that Tumpa had been decertified as a Table Games Dealer at the time of his termination.

Moreover, an employer's subjective expectations, such as work performance issues, are more appropriately analyzed at the pretext stage of the *McDonnell-Douglas* burden shifting analysis. *Jalil*, 873 F.2d at 707; *Weldon v. Kraft Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) (citing *Fowle v. C & C Cola*, 868 F.2d 59064-65 (3d Cir. 1989)). *See also Blozis v. Mellon Trust of Del. Nat'l Ass'n*, 495 F. Supp. 2d 258, 268 (D. Del. 2007) (despite the fact that plaintiff was on a corrective action plan for persistent performance problems which ultimately led to her termination, the court found she was qualified for her job position having received favorable reviews of her work performance for approximately 11 years prior to the change in job responsibilities, in her prima facie case of age discrimination); *Wesley v. Palace Rehab. & Care Ctr, LLC*, 3 F. Supp. 3d 221, 235 (D. N.J. 2014) (subjective criteria—perpetual tardiness and insufficient documentation—proffered by defendants to show plaintiff was not qualified for the position were properly reserved for analysis of legitimate business reason and pretext). "'When a defendant's argument regarding a plaintiff's qualifications is intertwined with its assertion of a legitimate reason for the employment action, courts should be careful not to collapse the entire *McDonnell Douglas*

"Typically, this minimum requirement will take the form of some type of licensing requirement, such as a medical, law, or pilot's license, or an analogous requirement measured by an external or independent body rather than the court or the jury." *Id.* In the case at bar, evidence that Tumpa was certified or de-certified as a Table Games Dealer would be relevant to establishing whether he met the bare minimum requirement to perform his position.

analysis in [the] first step.'"  *Howell v. Millersville Univ. of Pa.*, 283 F. Supp. 3d 309, 323 (E.D.Pa. 2017), *aff'd*, No. 17-3538, ___ F. App'x ___, 2018 WL 4236592 (3d Cir. Sept. 6, 2018) (quoting *DiFrancesco v. A–G Adm'rs, Inc.*, No. CIV.A. 13-4284, 2014 WL 4379114, at *7 (E.D. Pa. Sept. 4, 2014), *aff'd*, 625 F. App'x 95 (3d Cir. 2015)).

Here the evidence shows that Tumpa received favorable annual reviews of his work performance in June of 2014 and June of 2015, with an overall rating of "meets expectations" on both reviews, despite numerous surveillance infractions and mandatory retraining on table games from June of 2013 through June of 2015. *See* Exs. E through GG, Def.'s App. of Exs. in Supp. of Mot. for Summ. J. (ECF No. 39-1 at 62 to 123).  Based on this evidence, and a lack of evidence showing that Tumpa was de-certified as a Table Games Dealer at the time of his termination, a reasonable jury could find that Tumpa was qualified for the position of Table Games Dealer.  Thus, the Court finds that Tumpa has met his burden as to the third prong of his prima facie case.

With regard to the fourth element, Tumpa can satisfy his burden by showing that he was ultimately replaced by a sufficiently younger person to create an inference of a discriminatory motive.  *Willis,* 808 F.3d at 644; *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 356-57 (3d Cir. 1999) (citing *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 793 (3d Cir. 1985)). Alternatively, Tumpa can meet his burden by showing that similarly situated younger employees were treated more favorably than he.  *See Sarullo,* 352 F.3d at 798 (citing *Pivirotto,* 191 F.3d at 352 (quoting *Furnco Constr.*, 438 U.S. at 577 (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15 (1977)))).

The Casino argues that Tumpa's prima facie case fails because he has not demonstrated that his termination raises an inference of discrimination. In particular, the Casino submits that none of the alleged comparators identified by Tumpa[6] are similarly situated, because none of these alleged comparators were on a "last-chance agreement" at the time of the alleged infractions, and none had exhibited performance issues spanning a number of years at the time of the alleged infractions.[7] Therefore, the Casino submits that Tumpa has failed to establish the fourth element of his prima facie case.

In response, Tumpa argues that he has satisfied the fourth element because he has demonstrated that he was replaced by other employees who were sufficiently younger than he was at the time of his termination. Tumpa submits that the evidence shows that the majority of employees hired as Table Games Dealers after he was terminated were under 40 years of age. Moreover, because the employees hired after his termination were employed in the same position that he held at the time of his termination, Tumpa maintains that they had the same job responsibilities and level of supervision and therefore were similarly situated to him. Thus, Tumpa contends that he has established the fourth element of his prima facie case.

---

[6] The alleged comparators discussed by the Casino in its opening brief are the ones listed by Tumpa in paragraph 36 of his Amended Complaint (ECF No. 1-11), namely: John "Olsheski" Ozohonish; Kenita Tomlin; Dave Thomas; Chelsea Spohn; Tommy "Tom" Ribniscky; Omar Olmo; Maria Brioli; Frank Rusnock; Marcie Rogers, Darlene "Diane" Wilson; Lucinda Like; and Greg Myers.

[7] In its supporting brief, the Casino makes a number of statements about the alleged comparators' history of infractions (or lack thereof) which are neither supported by the cited exhibit or supported by any citation to the record. The Court has disregarded all of these unsupported statements in deciding the summary judgment motion.

Giving Tumpa the benefit of all favorable inferences, the Court finds that he has demonstrated that he was ultimately replaced by a sufficiently younger person to create an inference of a discriminatory motive. Based on the record, a reasonable jury could conclude that Tumpa was replaced by one of the newly hired, sufficiently younger, Table Games Dealers. Although the Casino did not identify which new hire replaced him, Tumpa identified five new hires—Chris Swartz, Sara Schmansky, Shelby Burkett, Taryn Dillie, and Zack Settles—all of whom were in their twenties when they were hired. Am. Compl. ¶ 38; *see also* Young Dep. at 77-79, 81; Swider Dep. at 35, Pl.'s Ex. H (ECF No. 42-8). During his deposition, Stan Swider, Assistant Shift Floor Supervisor, testified that he did not know of anyone over 50 years of age who had been hired as a Tables Game Dealer since Tumpa had been terminated. Swider Dep. at 38. Moreover, Rutherford, in providing a breakdown of the newly hired dealers by age, merely divided them into 2 groups—those under 40 and those over 40 years of age. Two of the ten newly hired dealers in June of 2016 were over the age of 40; while one of the seven dealers hired from the dealer school that started in August of 2016 was over 40.

The Court of Appeals has made clear that to establish the fourth element of his prima facie case, a plaintiff does not have to show that his replacement was younger than 40, but rather, he may establish the fourth element by showing that he was replaced by a person sufficiently younger, even though the replacement is within his class—40 or older—to permit an inference of age discrimination. *See Maxfield*, 766 F.2d at 792-93 (discussing decisions from the Eleventh, Fifth, Second, District of Columbia, and Sixth Circuits, all of which held that the replacement need not be younger than 40); *see also*

*Barber v. CSX Distribution Servs.*, 68 F.3d 694, 699 (3d Cir. 1995) (citing *Maxfield*, 766 F.2d at 792) (holding that the replacement, who was over age forty and eight years younger than the plaintiff, was "sufficiently younger" than the plaintiff for purposes of a prima facie case of age discrimination).

The Third Circuit has declined to adopt a bright-line rule that a particular age difference between a terminated plaintiff and those who assume his job duties is, as a matter of law, sufficient to give rise to an inference of age discrimination. *Monaco v. Am.Gen. Assurance Co.*, 359 F.3d 296, 307 (3d Cir. 2004) (citing *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231 236 (3d Cir. 1999)). Rather, the court of appeals has stated that "there is no particular age difference that must be shown, but while different courts have held . . . that a five year difference *can* be sufficient, . . . a one year difference cannot." *Showalter*, 190 F.3d at 236 (citations omitted) (emphasis added). A number of district courts in this Circuit have held that an age gap of less than five years is, as a matter of law, insufficient to establish the fourth element of a prima facie case. *Carter v. Mid-Atlantic Healthcare, LLC*, 228 F. Supp. 3d 495, 502-03 (E.D. Pa. 2017) (collecting cases). On the other hand, several district courts in this Circuit have concluded that an age difference of less than five years, when viewed together with other evidence, satisfied the fourth element of the plaintiff's prima facie case. *Id.* (citing *Robinson v. Matthews Int'l Corp.*, Civ. A. No. 06-1504, 2009 WL 735876, at *11 (W.D. Pa. Mar. 20, 2009), *aff'd*, 368 F. App'x 301 (3dCir. 2010) (four year age difference)); *Von Rudenborg v. DiGiorgio Corp.*, Civ. A. No. 08-5791, 2011 WL 4594220, at *5 (D.N.J. Sept. 30, 2011) (three year age difference)). In *Carter*, the district court concluded that a four year and five months age difference was sufficient,

when considering that the Third Circuit has not established a minimum age differential, and the "Supreme Court has recognized that a 'prima facie case operates as a flexible evidentiary standard' and was 'never intended to be rigid, mechanized, or ritualistic.'" 228 F. Supp. 3d at 504 (quoting *Swierkiewica v. Sorema N. A.*, 534 U.S. 506, 512 (2002); *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

The Casino does not argue that the newly hired employees were not sufficiently younger, but rather, merely divides the newly hired employees into the two categories— older than 40 and younger than 40. In addition, the Court notes that the Casino has not presented any argument in reply to Tumpa's argument that the newly hired dealers were sufficiently younger than he. Thus, a jury could reasonably infer that none of the new hires was older than 50, making the age difference between Tumpa and new hires, at a minimum, 14 years, which is sufficient to give rise to an inference of age discrimination. Accordingly, the Court finds that Tumpa has satisfied the fourth element of his prima facie case of age discrimination.

### 2. The Casino's Legitimate, Non-Discriminatory Reasons For Terminating Tumpa

The burden now shifts to the Casino to articulate a legitimate, non-discriminatory reason for terminating Tumpa. At this stage, a defendant's burden is "relatively light" and is satisfied where the employer "provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (internal citations and quotation marks omitted). District courts have routinely accepted evidence of ongoing performance deficiencies as "facially legitimate, non-discriminatory reasons for adverse employment decisions." *Carter*, 228

F. Supp. 3d at 505 (citing *Cellucci v. RBS Citizens, N.A.*, 987 F.Supp.2d 578, 590 (E.D. Pa. 2013) ("determining that the defendant employer met its burden by setting forth 'evidence that [the plaintiff's] employment was terminated due to her ongoing performance deficiencies'"); *Cridland v. Kmart Corp.*, 929 F.Supp.2d 377, 387 (E.D. Pa. 2013) ("'The Court finds [the defendant] has carried its burden [because] it has presented sufficient evidence to show it terminated [the plaintiff] based not on his age but on his continued, inadequate performance[.]'")).

After reviewing the record, the Court finds that the Casino has met its burden of establishing that it had a legitimate, non-discriminatory reason for terminating Tumpa. The Casino states that it terminated Tumpa for his repeated gaming and mis-play errors, which are well documented in the record. Moreover, Tumpa does not dispute that he committed these errors (with possibly one exception). Thus, since the Casino has met its burden at step two, the Court turns its analysis to step three of the *McDonnell Douglas* test.

### 3. The Casino's Reasons Were Not Pretextual

The burden of production/persuasion now shifts back to Tumpa to prove by a preponderance of the evidence that the legitimate, non-discriminatory reason proffered by the Casino was not the true reason for his termination, but was merely a pretext for discrimination. *Willis*, 808 F.3d at 644 (citation omitted). The Casino submits that Tumpa has not presented any evidence to show, or raise a question of fact, that its reason for terminating him is a pretext for age discrimination.

To survive a motion for summary judgment at the third step of the burden shifting analysis, Tumpa must present some evidence, either direct or circumstantial,[8] from which a jury could reasonably either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir. 1992)). The two prongs of the *Fuentes* test are distinct, and therefore, the Court will analyze both prongs to determine whether Tumpa has presented sufficient evidence to withstand summary judgment.

### a. First Prong of *Fuentes* Test

The first prong of the *Fuentes* test focuses on whether the plaintiff has submitted evidence from which a fact-finder could reasonably disbelieve the employer's articulated

---

[8] With regard to circumstantial evidence, the court of appeals explained:

> To establish such circumstantial proof, the plaintiff first must present evidence that each of the defendant's reasons is pretextual, viz, each reason was "a post hoc fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994). This proof of pretext then may be combined by the factfinder with the evidence used to support the plaintiff's prima facie case of age discrimination, and from this union, the factfinder may reasonably infer that the defendant discriminated against the plaintiff because of his age. *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749.

*Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 136 (3d Cir. 1997) (footnote omitted).

legitimate reasons for the adverse action. To satisfy this prong and discredit the employer's proffered reasons, the plaintiff:

> cannot simply show that his employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Id.* at 765 (quoting *Ezold*, 983 F.2d at 531 & 533) (other internal citations omitted) (emphasis in original). In other words, the plaintiff must prove "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc). Thus, in analyzing this prong, "'federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'" *Id.* (quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir. 1996)).

As to this prong of the *Fuentes* test, the Casino submits that Tumpa has failed to present any evidence to disprove its well-documented reasons for his termination. Indeed, in his brief in opposition to summary judgment, Tumpa does not address the first prong of *Fuentes*, but proceeds directly to a discussion of the evidence he believes

supports the second prong of *Fuentes*. Thus, the Court finds that a jury could not reasonably conclude that Tumpa has established pretext under the first prong of *Fuentes*.

### b. Second Prong of *Fuentes* Test

Under the second prong of the *Fuentes* test, the plaintiff "must identify evidence in the summary judgment record that 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause'" of his discharge. *Keller, 130 F.3d at 1111* (quoting *Fuentes, 32 F.3d at 762*). The plaintiff can meet this burden by proving that the employer either: (1) "previously discriminated against [him]," (2) "discriminated against other persons within [his] protected class or within another protected class," or (3) treated similarly situated individuals outside the protected class more favorably than the plaintiff. *Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998)* (citing *Fuentes, 32 F.3d at 765*). Here Tumpa is attempting to prove age was more likely than not the motivating factor in his discharge under the third option,[9] as he has identified a number of co-workers whom he claims are "substantially" younger than he and were treated more favorably for similar infractions.

The younger individuals identified by Tumpa in his Counterstatement of Undisputed Material Facts (ECF No. 44) and opposition brief include Chris Swartz,[10] Sara Shemanski,[11] Zach Settles and Shelby Burkett. Pl.'s Br. in Opp'n at 23 (citing Pl.'s CMF ¶¶ 39-43, 50-52). Tumpa asserts that these individuals held the same job as he, were

---

[9] There is no evidence in the record to show that either of the first two circumstances are present here.

[10] Incorrectly referred to by Tumpa as Chris "Schwartz."

[11] Incorrectly referred to by Tumpa as "Sarah Schmansky."

on the same supervisory level, often had the same supervisors, and were significantly younger.  Based on this information, Tumpa submits that a "factfinder could reasonably conclude that these proffered comparators were similarly situated and inferences can be drawn from the fact that they were treated more favorable and were not terminated, while [he] was."  *Id.*  Although the Court agrees that the evidence shows the identified individuals were significantly younger than Tumpa, were also employed as Table Games Dealers, and were supervised by some of the same supervisors—Marietta Barish, Mario DeFelice, and Blake Young, the Court does not agree with Tumpa's conclusion.  The record does not contain any evidence from which a factfinder could reasonably conclude that these individuals, or any of the other younger individuals named in his Amended Complaint, committed similar infractions with the same disciplinary history, or were not terminated when they failed to meet the conditions of a PIP.

In *Opsatnik v. Norfolk Southern Corp.,* the court of appeals articulated the following test for determining whether comparators are similarly situated:

> While "similarly situated" does not mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997). Which factors are relevant is determined by the context of each case, but often includes a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992); *see also Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir.2003)) ("In the context of personnel actions, the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees'

conduct." (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998))).

*Opsatnik v. Norfolk So. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009). *See also Thompson v. Kellogg's USA*, 619 F. App'x 141, 146 (3d Cir. 2015) (quoting *Radue*, 219 F.3d at 617-18).

As the late Judge Lancaster of this district so aptly noted in *Brooks v. USX Corp.*:

> Plaintiff's burden at the pretext stage of the analysis is to show with a level of specificity that the comparators were in fact treated more favorably. *Simpson*, 142 F.3d at 646. When establishing pretext, Plaintiff's claim cannot rest on the favorable treatment of a single non-class member, and Plaintiff cannot pick and choose a person perceived to be a valid comparator while ignoring comparators who were treated the same or less favorably than him. Id. at 646-47. Finally, when evaluating comparators, the focus is on the particular criteria identified by the employer as the reason for the adverse action. *Id.* at 647.

Civ. A. No. 05-47, 2006 WL 2547342, at *8 (W.D. Pa. Aug. 31, 2006). Thus, in determining whether the alleged comparators were, in fact, treated more favorably than Tumpa, the Court begins its analysis by focusing on the particular criteria identified by the Casino for discharging Tumpa.

The Casino states that it terminated Tumpa for his repeated gaming and mis-play errors, which are well documented in the record. For example, Rutherford stated that she made the decision to terminate Tumpa in June 2016 because he displayed repeated, continued, long-term gaming errors, and he was unable to complete the terms of his 60-day action plan, because his monetary errors during that period exceeded the $50 limit. 4/30/18 Rutherford Decl., ¶ 10. In addition, the record shows that during his employment, which lasted approximately three years, Tumpa committed over 100

surveillance infractions, as detailed on 52 Performance Documents. *See* Def.'s Exs. E through DDD. All of these infractions involved table games except for one occasion when Tumpa wore jeans without donating to the designated charity. Def.'s Ex. DD. Specifically, as of 6/3/14—just under one year of employment—Tumpa had accumulated 58 infractions over $750 in monetary errors, and as of his 6/20/15 annual review, Tumpa had committed another 43 infractions totaling $212. He received a final warning on 11/6/15 for committing 17 infractions costing $908 in errors in September and October of 2015. On 12/23/15, he was placed on a 90-day action plan by supervisors Young, DeFelice and Barish for committing 17 infractions costing $401 in errors during October and November of 2015. Def.'s Ex. RR. At the beginning of the 90-day action plan, Tumpa was told that if he incurred surveillance infractions resulting in monetary errors exceeding $50, he would be terminated immediately. Tumpa made $65 in monetary errors during that period. Def.'s Ex. TT & UU. Consequently, Tumpa was suspended by Barish, and subsequently, terminated on 3/26/16 by Young after review by HR. *Id.* Although the parties dispute the reason for his reinstatement,[12] Tumpa returned to the Casino and was immediately placed on a 60-day PIP, commencing 4/22/16, during which he was limited to no more than $50 in monetary errors. Def.'s Exs. VV-CCC. Tumpa was told that if he exceeded the $50 limit, he would be immediately terminated. On 6/16/16, Tumpa committed two $10 errors for a total of $65 in monetary

---

[12] *See* Note 2, *supra.*

infractions. Def.'s Ex. DDD.  As a result, Young informed Tumpa on 6/17/16 that he was being terminated effectively immediately.  *Id.*[13]

By comparison, the record shows that the alleged comparators either (1) were disciplined for entirely different infractions than those committed by Tumpa, and/or (2) had not accumulated anywhere near the volume of infractions that Tumpa did during his employment with the Casino.[14]  In addition, none of the Performance Documents for the alleged comparators show that any of them were placed on a PIP or action plan, let alone exceeded the allowed number of infractions during the PIP/action plan and were not terminated.

Of the four younger individuals identified above, the record is devoid of any evidence of infractions or other disciplinary history as to Swartz and Settles.  With regard to Sara Shemanski, the record merely establishes that she made several mistakes on several games and was not terminated.  Rusnock Aff. ¶¶ 11-12; Demko Aff. ¶¶ 21-22.

---

[13] Tumpa asks the Court to focus on the fact that he was well-liked by the customers and his co-workers, and excelled at customer service, as evidence that his termination was based on a discriminatory motive.  However, "the employee's positive performance in another category is not relevant" to the pretext inquiry, *Simpson*, 142 F.3d at 647 (citing *Ezold*, 983 F.2d at 528), "and neither is the employee's judgment as to the importance of the stated criterion," *id.* (citing *Healy v. New York Life Ins. Co.*, 860 F.2d 1209-1216 (3d Cir. 1988)).

[14] The Court has attached to this Opinion a spreadsheet, identified as Court Exhibit A, listing the alleged comparators, their positions, the date of the infraction(s), their supervisor, the nature of the infraction, the discipline received, their age if established, and the supporting exhibit(s).  This spreadsheet was compiled from the Performance Documents issued by the Casino whenever some disciplinary action was being taken against an alleged comparator, *see* Def.'s Exs. III – SSS (ECF No. 39-1 at 211-245), and was supplemented by other exhibits in the record, as noted.

As for Shelby Burkett, the record shows that she was initially hired as an attendant on 10/1/15, and subsequently hired as a dealer-trainee on 3/25/16. 4/30/18 Rutherford Decl. ¶16. She was promoted to dealer on 6/17/16 after successfully completing dealers' school. *Id.* At 21 years of age, Burkett is sufficiently younger than Tumpa. *See* Am. Compl. ¶ 38(c); Young Dep. at 78-79. The record shows that Demko reported an incident involving Burkett in September of 2016 where he observed her consuming several alcoholic beverages during lunch before she reported to work. Demko contends that Burkett reported to work under the influence of alcohol, in violation of company policy, and was not disciplined or terminated. Demko Aff. ¶ 23; Def.'s Ex. UUU. However, management investigated the incident and ultimately determined she was not intoxicated.[15] In addition, Burkett's drinking incident differs from the numerous and continuous monetary infractions for which Tumpa was eventually terminated, and thus, cannot provide a basis for establishing that Burkett is a valid comparator.

On the other hand, Frank Rusnock and Dave Demko both stated in their affidavits that Burkett was a horrible dealer who made countless financial mistakes and was not terminated.[16] Rusnock Aff. ¶¶ 14-15; Demko Aff. ¶ 25. Other than these general

---

[15] Casino management promptly investigated this incident and determined that no violation had occurred. Before Burkett's shift, Rutherford, Barish and Young met with her and found no signs of impairment. In addition, Barish monitored Burkett during her entire shift and observed no signs of intoxication. Def.'s Ex. UUU.

[16] Both Rusnock's and Demko's supervision of Burkett as a dealer is limited to the period from 6/17/16 to November 2016, as they each resigned in October and November 2016, respectively. Rusnock Aff. ¶1, Pl.'s Ex. F (ECF No. 42-6); Demko Aff. ¶ 1, Pl.'s Ex. G (ECF No. 42-7).

statements by Rusnock and Demko, the record does not contain any Performance Documents or other evidence showing the number of any infractions or amount of monetary errors incurred by Burkett, the periods of time over which they were incurred, or any disciplinary measures imposed. Moreover, Demko's and Rusnock's oberservations of Burkett's performance were made over a four to five-month period—hardly the equivalent to the three-year period of performance and history of infractions incurred by Tumpa. Nor is there any evidence that Burkett was placed on a PIP or action plan, exceeded the number of infractions allowed, and yet was not terminated. Thus, the general, unsubstantiated statements by Demko and Rusnock are not sufficient to raise an issue of fact as to Burkett. Even if the statements could be so construed by a reasonable jury, one instance of favorable treatment is not sufficient to demonstrate pretext. *Simpson*, *142 F.3d at 646* (evidence that one non-member of the protected class was allegedly treated more favorably than a member of the protected class may be enough at the prima facie stage of the analysis, but is insufficient to demonstrate pretext).

In addition to the above-named younger individuals, Tumpa proffers as alleged comparators Frank Rusnock, a woman named "Marcie," a woman named "Diane," Chelsea Spohn, Tommy Rebniscky, and Omar Olmo. Pl.'s CMF ¶¶ 27, 66-69, 71; Pl.'s Opp'n Br. at 26, 29-32.

Frank Rusnock was a dual-rate *supervisor* who received a final warning on 9/21/16 for multiple Pennsylvania gaming regulation violations causing the Casino to lose $1,000

on Blackjack. Def.'s Ex. QQQ.[17] Rusnock was also supervised by Blake Young. *Id.* Tumpa does not know or recall if Rusnock had any other infractions in his personnel file. Pl.'s Dep. at 88-90 ([ECF No. 39-1 at 53-55](#)). Nonetheless, Tumpa stated that he knows that Rusnock was on a PIP because Rusnock told him that he (Rusnock) had to be retrained on Blackjack. *Id.* at 90. Tumpa's conclusion—that Rusnock was on a PIP because he had to be retrained on Blackjack—is an assumption that is not supported by the record. The SIP states that retraining is required with a first written warning. Also, the Performance Documents show that Tumpa was retrained on several occasions but was not on a PIP or action plan at the time. *See, e.g.,* Def.'s Exs. N, O, P & GG. Thus, just because an employee was being retrained on a particular Table Game does not lead to the conclusion that they were also on a PIP or action plan. Moreover, Tumpa testified that he did not know whether Rusnock had any infractions in his personnel file. Pl.'s Dep. at 90. [18]

In his Amended Complaint, Tumpa identified a dealer named "Marcie" who was younger than 40 who made several mistakes on various games and was not terminated but promoted to supervisor. Am. Compl., ¶ 36(g). The record shows that the only dealer

---

[17] At his deposition, Tumpa stated that Rusnock told him that he made a $1,000 mistake in Roulette and a $400 mistake in dealing Blackjack. Pl.'s Dep. at 88. Given that Tumpa's statement is hearsay and Rusnock does not substantiate it in his affidavit, which Tumpa submitted in support of his opposition to summary judgment, *see* Pl.'s Ex. F, the Court finds that Tumpa's statement does not raise an issue fact as to the nature of Rusnock's infraction, nor is it material to determining whether Rusnock is similarly situated to Tumpa.

[18] Eventually, Rusnock resigned on 10/5/16. Rusnock Aff. ¶ 1.

named "Marcie" who was promoted to supervisor is Marcie Rogers.[19]   Ms. Rogers was

supervised by Rusnock, who stated that Rogers made several mistakes on various games

and was promoted to full-time supervisor.  Rusnock Aff. ¶ 9.  Rogers was 41 years old at

the time of her promotion.  4/30/18 Rutherford Decl. ¶ 12.[20]   Although Rogers was

sufficiently younger than Tumpa, the record does not establish that she had a disciplinary

history similar to Tumpa or was on a PIP at the time of her promotion.  Tumpa testified

that he overheard Rogers telling other employees that she had infractions and write-ups

(Pl.'s Dep. at 90-91); despite the hearsay nature of this statement, the record is devoid of

any Performance Documents supporting the number of infractions by Rogers.  Nor does

---

[19] At her deposition, Rutherford testified that there were two dealers named "Marcie" — one who was a dealer, and one who was a dealer and dual rate supervisor and was promoted to a supervisor.  Rutherford Dep. at 100-101.  Rutherford identified the latter as Marcie Rogers.  *Id.* at 101.  At her deposition, Rutherford did not know the age of Ms. Rogers.  *Id.*  It appears from Demko's affidavit that the other "Marcie" is Marcy Kalasky, who was a dealer not a supervisor, and was approximately 47 years of age at the time of Tumpa's discharge.  Demko Aff. ¶¶ 17-18; Supp. Rutherford Decl. ¶¶ 6-7, Def.'s Ex. UUU.  However, Ms. Rogers is the only Marcie who fits Tumpa's description in paragragh 36(g) of the Amended Complaint.

[20] Tumpa disputes that Marcie Rogers is the "Marcie" he names in his Amended Complaint in paragraph 36(g) as being under 40 years of age, because the evidence shows that Rogers was actually 41 years of age at the time of her promotion.  4/30/18 Rutherford Decl. ¶12 ("According to the Casino's employment records for Marcie Rogers, Ms. Rogers was 41 years old at the time she was promoted to full-time Supervisor at the Casino.").  Not satisfied with this evidence, Tumpa argues that the Casino has not produced any employment records for a Marcie Rogers that would show her date of birth.  Pl.'s Opp'n Br. at 29.   Tumpa appears to believe, incorrectly, that he must show that the alleged comparators were not in his class — i.e., 40 or older.  But as the Court has pointed out earlier, that benchmark is irrelevant.  Rather, the determining factor is whether the comparators are "sufficiently younger" than Tumpa.  *See* Discussion, *supra* at 16-18.

Tumpa know if Rogers was on a PIP at the time she made the errors referred to by Rusnock. *Id.* at 91.[21]

In his Amended Complaint, Tumpa also named a dealer named "Diane" who was younger than 40 and "was so inadequate as a dealer that Defendant made her a pit secretary and then a slot attendant. She was not terminated for her inadequacies." Am. Compl. ¶ 36(h). However, the record shows that no one named "Diane" was employed at the Casino as a dealer. *See* Pl.'s CMF ¶ 69; Def.'s Resp. to Pl.'s CMF ¶ 69 ([ECF No. 47](#)). The record does show that the Casino did employ Darlene Wilson, a part-time, duel-rate dealer/supervisor, who was supervised by Rusnock. Rusnock Aff. ¶ 16. According to Rusnock, Wilson made numerous financial mistakes as a dealer and was not terminated but promoted to pit secretary/boss. *Id.* Wilson was in her 60's at the time she was promoted to full-time Dual-Rate Dealer and Pit Clerk, 4/30/18 Rutherford Decl. ¶13, and thus close in age to Tumpa who was 64 at the time of his termination. Thus, Wilson appears to be someone who is not sufficiently younger than Tumpa who was promoted, despite numerous financial mistakes, although the record does not establish how many infractions she committed or the amount of her financial mistakes during her employment. Pl.'s Dep. at 91-92.

Alleged comparators Chelsea Spohn, Tommy Ribniscky, and Omar Olmo all received first written warnings for infractions of $100 or more on table games, and none of them had the same supervisor as Tumpa. Def.'s Exs. MMM, NNN, & OOO. Tumpa

---

[21] It appears that Marcie Rogers is no longer employed by the Casino. *See* Swider Dep. at 53.

has no knowledge of any prior infractions by Ribniscky or whether he was on a PIP. Pl.'s Dep. at 86. As to both Spohn and Olmo, Tumpa testified that they told him that they had other infractions by way of monetary mistakes in their personnel files (again, hearsay),[22] but he did not know how many infractions each had made, and did not know if either was placed on a PIP. *Id.* at 85-87.

Other alleged comparators identified by Tumpa in his Amended Complaint include John Ozohonish, Kenita Tomlin, Dave Thomas, Maria Brioli, Lucinda Like, and Greg Myers. Am. Compl. ¶¶ 35 & 36(a), (e), (i), & (j). Ozohonish and Tomlin are not similarly situated to Tumpa, as they received final warnings for insubordination and early out and attendance issues, respectively.[23] Def.'s Exs. III, JJJ, & KKK. Moreover, Tumpa admitted at his deposition that he had no personal knowledge of the number of infractions committed by either Ozohonish or Tomlin. Pl.'s Dep. at 84-85.

Dave Thomas received a final warning for an infraction in excess of $250 involving a Blackjack Table Game on 9/24/16. Def.'s Ex. LLL. Although he had the same

---

[22] Tumpa submits that at the time of trial, he expects to call Spohn, Ribniscky, and Olmo to testify regarding whether they have accumulated additional disciplinary actions by the Casino. Pl.'s Opp'n Br. at 33. The record is devoid, however, of any evidence from any of these witnesses. Thus, "[s]peculation [that evidence of accumulated additional disciplinary actions against these witnesses] might be adduced at trial is not sufficient to overcome summary judgment." *DiGerolamo v. Gale*, Civ. No. 11-6006, 2014 WL 523005, at *6 (D. N.J. Feb. 7, 2014) (citing *Del Carmen Guadalupe v. Agosto*, 299 F. 3d 15, 23 (1st Cir. 2002) ("A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial.")).

[23] The Casino submits in its supporting brief that Tomlin was terminated on 4/12/16 for no call/no show but fails to cite any support for this statement in the record. Def.'s Br. at 10.

supervisor (Blake Young) as Tumpa, this is the only Performance Document in the record for Thomas, *id.*, and Tumpa has no knowledge of how many infractions Thomas had in his personnel file or if he was on any sort of PIP. Pl.'s Dep. at 85.

Maria Brioli was a dual-rate dealer and supervisor who received a first warning for her inadequate supervision of an employee who committed a gaming violation mispay of $4,000. Def.'s Ex. PPP. She was also supervised by Blake Young. *Id.* Tumpa stated that Brioli told him about this infraction and that she had others, but he does not know how many there were or the nature of the infraction. Pl.'s Dep. at 88. He does not recall if Brioli was placed on a PIP. *Id.*

As to Lucinda Like, Tumpa testified that Dave Demko told him that Like made an $8,000 mistake while working as a table games dealer and was not terminated for her mistake. Pl.'s Dep. at 92; *see also* Demko Aff. ¶ 13. The Performance Document issued on 7/19/16 indicates that Like actually made a $6,400 error, was issued a final written warning and instructed to review the training manuals for all of the games that she deals. Def.'s Ex. RRR. She was eventually terminated for a monetary error between "14- and $3,000." *See* Young Dep. at 76. Like was in her mid-50s when she committed the $6,400 error in July of 2016. 4/31/18 Rutherford Decl. ¶ 14. The record does not establish Like's disciplinary history or whether she was on a PIP at the time she committed the $6,400 error.[24]

---

[24] Although Tumpa testified at his deposition that he overheard Like talking to other employees about infractions in her personnel file, Pl.'s Dep. at 93, that statement is inadmissible hearsay. In any event, it does not create an issue of fact with respect to whether Like was similarly situated to Tumpa.

Finally, alleged comparator Greg Myers was not similarly situated to Tumpa. Myers' infraction occurred when he verified the payout from Linda Like's table game that was $6,400 too much, in his role as her *supervisor*. Def.'s Ex. SSS. Myers, who was in his 30's at the time of this infraction, received a final written warning, and was instructed to review the training manuals for all games that Linda Like was dealing. *Id.*; Young Dep. at 77. The record does not establish that Myers had a disciplinary history similar to Tumpa or that he was on a PIP at the time of the infraction. Pl.'s Dep. at 94-95.

In summary, the record evidence does not support a reasonable inference that the alleged comparators committed the same volume of monetary infractions on table games that Tumpa did over a three-year period, and that they exceeded a monetary limit while on a PIP and were not terminated. Thus, the Court finds that no jury could reasonably conclude that the alleged comparators were similarly situated to Tumpa.

Having failed to proffer evidence to show, or at least raise a material issue of fact on whether, the alleged comparators were similarly situated, Tumpa advances several other arguments in an attempt to defeat summary judgment, none of which have any merit. First, Tumpa submits that he was not provided mandatory retraining while on his PIP as required by Casino policy. This is much ado about nothing. The SIP does not state that retraining is *mandatory* when on a PIP, and, in fact, the SIP does not even mention PIPs or action plans. The SIP does provide that mandatory retraining is required when a first written warning is issued for either (1) six infractions within 60 days on the same table game type, or (2) total infractions in excess of $100. Def.'s Ex. C. Mandatory retraining is not mentioned anywhere else in the SIP.

Tumpa appears to be relying on language in the Table Games ICER Policy ("ICER Policy"),[25] which states that "[a]ny team member who accumulates 15 points will receive a final written warning and will be placed on a retraining action plan." *Id.* However, this policy appears to address paperwork errors for which the Casino is accountable to, and audited by, the PGCB, not surveillance infractions for dealing mistakes. Moreover, the ICER Policy states that an employee shall receive a final written warning and be placed on a "retraining action plan" when he or she accumulates 15 points. The record does not show that Tumpa had accumulated 15 points under the ICER Policy as of December 2015. Rather, the record shows that he was being placed on a 90-day action plan beginning on 12/16/15 due to sub-par performance as a Table Games Dealer based on 17 surveillance infractions in the 60-day period from 10/1/15 to 12/1/15, resulting in $401 in monetary discrepancies. Pl.'s Ex. U. Thus, under the relevant Casino policies, Tumpa was not entitled to mandatory retraining as part of his 90-day and/or subsequent 60-day action plans.

Tumpa further argues that younger, similarly situated, employees who were placed on PIPs were given mandatory retraining while he was not. The evidence of record does not support this argument. The documents—Pl.'s Ex. R (4/22/16 Memo to Tumpa regarding 60-day action plan)[26] and Pl.'s Ex. B (Young's Dep. at 74)—cited by Tumpa, for the position that other similarly situated employees—employees on 60-day

---

[25] ICER stands for Internal Control Exception Report. Def.'s Ex. C ([ECF No. 39-1 at 29](#)). These reports are generated whenever paperwork errors, such as incomplete, illegible, or missing forms for reporting revenue, are recorded by revenue audit and regulatory compliance. *Id.*

[26] The 4/22/16 Memo is also found in the Casino's appendix as Def.'s Ex. VV.

action plans—were often times required to be retrained, simply do not support his position.

Tumpa also proffers the Casino's treatment of Frank Rusnock; however, this too falls short of the mark. Tumpa *presumes* that because Rusnock was retrained on Black Jack he must have been on a PIP. Pl.'s Dep. at 90. The record is simply devoid of any evidence to support Tumpa's theory. Instead, the record shows that the SIP provides for mandatory retraining with the first written warning. Also, Rusnock does not address the situation which mandated his retraining in his affidavit, and the only Performance Document relating to Rusnock indicates he was given a final warning on 9/21/16 for a surveillance infraction of more than $300. *See* Def.'s Ex. QQQ ([ECF No. 39-1 at 240-41](#)).

Nor does Stan Swider's deposition testimony support Tumpa's argument. Although Swider testified that he recalled employees receiving mandatory retraining as part of the action plan, Swider Dep. at 26-27 ([ECF No. 42-8 at 3-4](#)), it is unclear whether his statement was in reference to the SIP or the ICER Policy. Moreover, Swider did not identify the employees whom he recalled receiving mandatory retraining and therefore neither the ages of those employees nor the basis for the mandatory retraining are known. As such, neither Rusnock's nor Swider's testimony supports or raises an issue of fact as to whether sufficiently younger, similarly situated, employees, who were on PIPs, received mandatory retraining while Tumpa did not.

Next, Tumpa submits that he has presented evidence that the Casino's managers did not follow Casino policy for employees making financial infractions as outlined in the Dealer's Handbook, nor did they follow established company policies. In support,

Tumpa points to Demko's statements in his affidavit, in particular, that he observed management employing inconsistent disciplinary practices that were "all over the board." Demko Aff. ¶¶ 8 & 9.[27] As an example of an employee whom management treated more leniently, Demko pointed to Shelby Burkett. However, as the Court noted above, the record shows that management investigated Burkett's alleged consumption of alcohol prior to her shift and determined that Burkett did not violate the policy prohibiting employees from reporting to work under the influence of alcohol. *See* Discussion *supra* at 27. The record further shows that Burkett did not have a similar disciplinary history as Tumpa. *See* Discussion *supra* at 27-28.

Demko also identified Eric Gardner (Demko Aff. ¶ 10), Lucinda Like (*id.* at ¶ 13), Greg Myers (*id.* at ¶ 14), "Marcy" (*id.* at ¶¶ 17-18), and Maria Brioli (*id.* at ¶ 19), as examples of younger employees who were treated more leniently. As explained above, however, Lucinda Like, Greg Myers, Marcy Kalasky,[28] and Maria Brioli are not valid comparators. *See* Discussion *supra* at 29-31, 33-34. With regard to Eric Gardner, Demko stated that Gardner, a dual-rate dealer who was under 40 years of age and friendly with

[27] The Casino moved to strike paragraphs 8 and 9 of Demko's affidavit, for failure to provide a basis of personal knowledge of how the Casino enforces its policies, which the Court denied. *See* ECF No. 49. Although the statements in paragraphs 8 and 9 are "essentially conclusory" and lacking in specific facts, and thus, usually inadmissible, *see Shaw by Strain v. Stackhouse, 920 F.2d 1135, 1144 (3d Cir. 1990)* (citing *Maldonado v. Ramirez, 757 F.2d 48-51 (3d Cir. 1985)*), Demko follows up these conclusory opinions with examples of employees whom he contends were treated more leniently, and not in accordance with the Casino's policies, namely Eric Gardner, Lucinda Like, Greg Myers, "Marcy," Maria Brioli, Sara Shemanski, and Shelby Burkett. As explained elsewhere in this Opinion, however, the non-discriminatory basis for their different treatment is adequately supported by the record.

[28] The Court has presumed that the "Marcy" to which Demko is referring in his affidavit is Marcy Kalasky. See Note 19, *surpa*.

Rutherford, committed numerous financial mistakes and was not terminated until he accumulated over 13 points, well over the amount needed for termination. Demko Aff. ¶ 10. However, no other information regarding Gardner's disciplinary history is known. Moreover, the record does not establish how many points Tumpa had accumulated the time of his termination. Thus, no comparisons can be drawn between Gardner and Tumpa based solely on Demko's statement.

On the other hand, the record shows that the Casino actually followed its SIP for first written warnings with regard to Tumpa. Specifically, as a result of first warnings on 1/3/14 and 1/18/14, Tumpa was required to undergo retraining on Three-Card Poker and Baccarat, respectively (Def.'s Exs. J, N & P). Tumpa was also required to undergo retraining on Black Jack for a first warning received on 2/3/14 for committing six infractions in 60 days (Def.'s Ex. O). The record further shows that Tumpa was required to undergo retraining on Three-Card Poker and was recertified on 12/19/13 in conjunction with a final warning on 11/15/13 (Def.'s Exs. G & J). He also received a final warning on 11/6/15 and was required to undergo retraining on Three-Card Poker, Mini Baccarat, and Roulette (Def.'s Ex. OO).

Tumpa next submits that unlike Rusnock and other similarly situated employees, he was placed on the busiest table game in the Casino—$5 Black Jack—for his 60-day action plan. Tumpa testified he believes this was done to "set[ ] him up for defeat." Pl.'s Dep. at 120. He further testified that he believes it was based on his age because no one else had to do it. *Id.* Tumpa fails to cite any support for his argument other than his opinion. However, a non-movant cannot oppose summary judgment by offering

statements of mere belief or opinion. *Javornick v. United Parcel Serv., Inc.* Civ. A. No. 07-0195, 2008 WL 4462280, at *3 (W.D. Pa. Sept. 29, 2008). Even assuming his statement that "no one else had to do it" is true, that would mean all employees other than him—even employees older than 40—were not required to work the busiest table games while on an action plans. Plaintiff's "belief" actually infers that some employees over age 40 were treated better than he, thereby eliminating age as a factor. In addition, evidence exists in the record that undercuts Tumpa's argument. First, Demko stated that "Marcy"—presumably Marcy Kalasky—who was 47 at the time of Tumpa's termination, was placed on a low-limit table game for making numerous financial mistakes. Demko Aff. ¶ 18. Thus, although there is no evidence to support that she was on an action plan, Marcy, a sufficiently younger employee, was nonetheless placed on a busy, low-limit, table game for making financial mistakes. Second, the record evidence suggests that the Casino actually wanted Tumpa to succeed. For example, Young offered a viable explanation for assigning Tumpa to the $5 Black Jack table during his 60-day action plan—that due to the $50 limit for his action plan, Tumpa was placed on a lower limit Black Jack table game to protect him from making a $100 infraction compared to a $5 mistake. Young Dep. at 67: 4-11. In addition, Young testified that he told Tumpa, when he had just one or two days left on his 60-day action plan and only $5 left to reach his $50 limit, that he "probably should take the day off" so "he would be off his action plan and would have a chance to start over." Young Dep. at 68: 16-22.

For his next argument, Tumpa maintains that the $50 limit in total infractions was arbitrary and lower monetary limits were given to younger, similarly situated,

employees.[29]  There is simply no support in the record for Tumpa's statement that lower monetary limits were given to younger, similarly situated employees.  First, Tumpa does not identify who the younger, similarly situated employees are that allegedly received the lower monetary limits or what monetary limits were assigned to them.  Second, none of the documents cited by Tumpa—Am. Compl. ¶ 16; Pl.'s Exs. W & X—support his argument that younger employees were given lower monetary limits.  In fact, paragraph 16 of the Amended Complaint does not relate to this argument at all.  Exhibit W is the 9/21/16 Performance Document for Frank Rusnock, which does not say anything regarding lower monetary limits.  Similarly, Exhibit X is the 9/1/16 Performance Document for Omar Olmo, which indicates that Olmo received a first written warning for incurring a $100 error while dealing; it does not say anything regarding lower monetary limits.

In support of his argument that the $50 limit was arbitrary, Tumpa points to the Casino's statement in its ICER Policy:  "Management reserves the right to review all ICERs to determine appropriate level of disciplinary action."  Def.'s Ex. C.  The Court does not construe this statement as evidence that the Casino's monetary limit was arbitrary.  Preliminarily, the Court notes that Tumpa has failed to explain how the establishment of the $50 monetary limit for the 60-day action plan constitutes a "review [of an] ICER[ ] to determine [the] appropriate level of disciplinary action."  Second, Black's Law Dictionary defines "arbitrary" as "[d]epending on individual discretion; of,

---

[29] The decision to place the $50 monetary goal for Tumpa was made by Young, DeFelice, and Barish.  Pl.'s Ex. U.

relating to, or involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures." BLACK'S LAW DICTIONARY (10th ed. 2014). The plain language used by the Casino in its ICER Policy indicates that the review is anything but arbitrary. In fact, Young testified that the Casino Oversight Committee considers a number of factors in determining the discipline to be assigned for an infraction, including:

> whether the person's going to be retrained, if it was a monetary mistake and they took something from somebody, are we going to make an effort to get it back to the individual. How many mistakes this person had made in the past, what are you going to do for retraining, how many times have you retrained this person, and then we go from there with it.

Young Dep. at 73: 21-15 to 74: 1-7.

Finally, Tumpa contends that after he was cited for infractions made in the game of Black Jack and placed on a 60-day action plan, the Casino should have moved him to another Table Game, because he was struggling. Pl.'s Opp'n Br. at 25-26. According to Rutherford, the Casino does not have a written policy for moving employees to other games if they are having difficulty performing certain tasks, but it will move people around if they are struggling with one game as opposed to another. Rutherford Dep. at 99. Tumpa also points to Rutherford's testimony that before terminating him, the Casino could have decertified Tumpa as a Black Jack dealer and employed him another capacity. Rutherford Dep. at 69: 9-14. Rutherford was not aware if Young informed Tumpa of this option at the time of his termination. *Id.* In essence, Tumpa's argument questions whether the disciplinary action taken by the Casino was too harsh, and whether a lesser

discipline should have been imposed.[30]  However, it is not the Court's role to decide what discipline Tumpa should have received.  *See Carver v. D.C.I. Chippewa Clinic*, No. 2:05 CV 0122, 2006 WL 2927628, at * 11 (W.D. Pa. Oct. 12, 2006) (citing *Logue v. Int'l Rehab. Assocs., Inc.*, 837 F.2d 150, 155 n. 5 (3d Cir. 1988) ( "[O]ur task is not to assess the overall fairness of [the] ... employer's actions.").  Rather, the court's "'inquiry must concern pretext, and is not an independent assessment of how [it] might evaluate and treat a loyal employee.'" *Id.* (quoting *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1216 (3d Cir.1988); *Hicks v. Arthur*, 878 F.Supp. 737, 739 (E.D.Pa.1995), *aff'd*, 72 F.3d 122 (3d Cir.1995) ("noting that the fact that a decision is ill-informed or ill-considered does not evince pretext")).  Moreover, it is irrelevant whether the Casino's "decision was wrong or mistaken," or whether it made an unsound business decision, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.  Here, Tumpa's challenge to the form of discipline imposed does not provide evidence of pretext, especially where the record shows that Tumpa does not deny having incurred the continuous surveillance infractions that brought about his placement on two, last-chance action plans, and that he failed to meet the conditions of those plans.

In closing, the Court is constrained to address a position repeated by Tumpa in his opposition brief.  Tumpa intimates that the Casino is responsible for the absence of employment records for many of the alleged comparators that would show their dates of

---

[30] This argument actually implicates the first prong of the *Fuentes* test.  *See* Discussion, *supra*, at 20-21.

birth, employment history, and disciplinary treatment. To the extent that Tumpa is attempting to show that the lack of the employment records for the alleged comparators constitutes evidence of pretext, his attempt misses the mark, as the responsibility for the absence of employment records falls squarely on him. Tumpa did not request the Casino to produce employment documents until eight days before the end of discovery, and that request was part of a deposition notice to the Casino's corporate designee, and not part of a request for production of documents. *See* Def.'s Mot. for Prot. Order at 2 ([ECF No. 32](#)). The motion for protective order was granted as to Tumpa's personnel file and the surveillance infractions made by him during 2015 and 2016, but denied as to all remaining documents.[31] *See* Text Order dated 3/26/18 (ECF No. 34). The record shows that Tumpa was aware of the alleged comparators' identities as early as 4/13/17 when he filed his Amended Complaint. Yet he waited until 3/15/18—eight days before discovery closed, to request employment records for *all* employees, not just the alleged comparators. Thus, the lack of employment records for the alleged comparators does not constitute evidence of pretext.

In light of the above discussion, the Court concludes that a reasonable jury could not infer that discrimination was more likely than not a motivating or determinative

---

[31] Tumpa requested, inter alia, all surveillance infractions made by the Casino's employees in 2015 and 2016; all documents regarding financial mistakes by the Casino's employees over $1,500 from July 2013 to present; and all surveillance logs from 2015 and 2016. Def.'s Mot. for Prot. Order at 3.

cause of Tumpa's termination.  Accordingly, the Court will grant Defendant's motion for summary judgment as to Tumpa's age discrimination claim under the ADEA.[32]

### B.    Failure to Exhaust the PHRA Administrative Claim

The Casino also moves for summary judgment on Tumpa's PHRA claim on the basis that he failed to administratively exhaust that claim.    According to the Casino, Tumpa did not file a charge of discrimination with the PHRC within 180 days of the alleged act of discrimination—in this case, his termination on June 18, 2016—as he was required to do under 43 P. S. § 959(h).  In support, the Casino cites to *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013).  The Casino submits that Tumpa filed his charge of discrimination with the PHRC, at the earliest, on January 18, 2017—the date of his letter to the EEOC—which was 214 days after his termination.  As he is well outside of his 180-day window to file his PHRA claim, the Casino maintains that his PHRA claim fails as a matter of law.

In response, Tumpa admits that he dual-filed an age discrimination complaint with the EEOC and PHRC on January 18, 2017, 214 days after his termination by the Casino.  He submits, however, that his PHRA claim was timely filed based on the deferral provisions under the ADEA, which allow a charge to be filed within 300 days of the alleged discriminatory act in deferral states such as Pennsylvania.  Because he filed his PHRA claim within 300 days as set by the EEOC, Tumpa argues that his PHRA claim was

---

[32] Even if this Court had determined that Tumpa had exhausted his PHRA administrative claim, *see* Discussion *infra* at 44-45, that claim would not survive summary judgment on substantive grounds for the same reasons articulated with regard to Tumpa's ADEA claim.  *See* Note 4, *supra*.

timely filed.   Tumpa misconstrues the applicable law.

"To bring suit under the PHRA, an administrative complaint must first be filed with the PHRC within 180 days of the alleged act of discrimination."  *Mandel*, 706 F.3d at 164 (citing 43 P.S. § 959(h)).  Here there is no dispute that Tumpa dual-filed his charge of discrimination, at the earliest, on January 18, 2017, more than 180 days after his termination.    Tumpa's attempt, however, to cure the untimely filing of his PHRA administrative claim, by relying on Pennsylvania being designated as a "referral state," and thus extending the statute of limitations for his PHRA administrative claim to 300 days, misses the mark.  The 300-day extension of the statute of limitations applies only to the charge brought before the EEOC, not to the PHRA filing.  *Id.* at 165 (citing 42 U.S.C. §2000e-5(e)(1)).  *See also Emmell v. Phoenixville Hosp. Co., LLC*, 303 F. Supp. 3d 314, 325 (E.D. Pa. 2018) (citing *Mandel*, 706 F.3d at 165) (other citation omitted).

Accordingly, the Court concludes that Tumpa's PHRA claim is time-barred, and therefore, will grant Defendant's motion for summary judgment on this claim.

IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court finds that no material issues of fact exist and that the Casino is entitled to judgment as a matter of law, as to Tumpa's ADEA and PHRA claims.   Accordingly, the Court will grant the Casino's Motion for Summary Judgment (ECF No. 37) in its entirely.  An appropriate order will follow.

Dated:  January 15, 2019          BY THE COURT:

LISA PUPO LENIHAN
United States Magistrate Judge

cc:     All Counsel of Record
        *Via Electronic Mail*